Vincent STEPHENS, Petitioner,

v.

Carolyn SABOL, Warden, Federal Medical Center, Devens, Respondent.

Civil Action No. 07cv40083–NG.

United States District Court, D. Massachusetts.

March 24, 2008.

Michael P. Sady, United States Attorney's Office, Boston, MA, for Respondent.

### MEMORANDUM AND ORDER GRANTING IN PART MOTION TO DISMISS AND GRANTING IN PART PETITION FOR HABEAS CORPUS

GERTNER, District Judge:

This case concerns the sequencing of sentences, how they begin, and whether they can be interrupted.

## I. BACKGROUND

### A. Facts

The facts are undisputed.

Petitioner Vincent Stephens ("Stephens" or "petitioner") committed two crimes approximately two weeks apart in the summer of 1994. On July 29, 1994, he committed a carjacking near a sandwich shop in Miami, Florida. On August 11, 1994, he robbed the same sandwich shop at gunpoint. Decl. of James Hazelton ("Hazelton Decl.") ¶ 4, Ex. 1 to Resp. Mem. Supp. Mot. Dismiss ("Resp. Mem.") (document # 7).[1]

Three days later, on August 14, 1994, Stephens was arrested by Miami police on state charges of robbery with a deadly weapon, armed burglary, and aggravated assault with a firearm. Each charge stemmed from the August 11 robbery. *Id.* Stephens was detained pending trial.

On December 6, 1994, Stephens was indicted in federal court for the July 29 carjacking. *Id.* He was brought into federal custody under a writ of habeas corpus ad prosequendum on July 31, 1995. *See* Writ of Habeas Corpus ad Prosequendum, *United States v. Stephens*, No. 94–cr–647 (S.D. Fla. filed July 24, 1995, document # 5). Stephens was convicted after a jury trial. On February 14, 1996, he was sentenced to eight years' imprisonment. *See* Judgment in a Criminal Case ("Federal Judgment") at 1–2, *United States v. Stephens*, Ex. A to Hazelton Decl. (document # 7). As of that date, he had not yet been tried or sentenced in state court. The federal judgment did not mention the pending state charges, or the relationship of the federal sentence to any state sentence that might be imposed. *See id.*

Stephens was returned to state custody on October 22, 1996. Individual Custody and Detention Report ("Custody Report"), Ex. B to Hazelton Decl. (document # 7). On February 10, 1997, Stephens was sentenced on multiple state counts; under a Florida law increasing punishment for a "habitual violent felony offender," he was committed for a 15–year term, with other, shorter sentences to run concurrently. *See* Sentence at 3 (filed Jan. 23, 2003), Ex. C to Hazelton Decl. (document # 7).[2] Notably, the state court judge "further ordered that the composite term of all sentences imposed ... shall run ... concurrent with the ... [sentence in] Federal Case # 94–647–001." *Id.* at 3. At his sentencing, Stephens was given credit for 912 days served, *id.*, reflecting the entirety of his time in custody from August 14, 1994, to February 10, 1997.

Stephens moved to vacate his state sentence in January 2001. While the motion was granted and his case set for resentencing on March 9, 2001, *see* Order (Jan. 10, 2001), Ex. F to Hazelton Decl. (document # 7), it is unclear whether the petitioner was, in fact, resentenced at that time.

Apparently unaware that Stephens was to be resentenced, officials at the Dade County Jail informed the United States Marshals that he had finished serving his state sentence and that the Marshals should execute the federal detainer lodged pursuant to his federal judgment and commitment order. *See* Custody Report at 1, Ex. B to Hazelton Decl. (document # 7) ("Dade Co Jail apparently made a mistake

---

**1.** Virtually all the evidence in this case is attached as exhibits to the Hazelton Declaration. When citing to those documents, the Court will for brevity's sake omit the full citation to the Respondent's Memorandum.

**2.** The revised sentence follows the Order Regarding Motion for Relief in Exhibit C. Its propriety is not before the Court.

by informing us that his [sic] finished w/his state se [sic].").  Consequently, Stephens was picked up by U.S. Marshals on September 20, 2001,[3] and placed in the Federal Corrections Institute at Jesup, Georgia ("FCI–Jesup"), on March 15, 2002.  *See* Custody Report at 2, Ex. B to Hazelton Decl. (document # 7); *accord* Federal Judgment at 2, Ex. A to Hazelton Decl. (document # 7).  About two months later, federal officials at FCI–Jesup realized that Stephens had not completed his state sentence.  They returned him to the Florida Department of Corrections on May 23, 2002.  Custody Report at 3, Ex. B to Hazelton Decl. (document # 7); Overall Inmate Record at 3 (June 10, 2003), Ex. E to Hazelton Decl. (document # 7).

On November 26, 2002, Stephens filed another motion to modify his state sentence.  *See* Order Regarding Motion for Relief at 1, Ex. C to Hazelton Decl. (document # 7).  The motion was granted, and Stephens was resentenced on January 22, 2003, nunc pro tunc February 14, 2002.[4] At that time, he was given a sentence of 9.4 years.  *Id.* at 2.  Unlike the previous sentence, the Florida court stated this time that the sentence "shall *not* run concurrently with [the] federal [sentence]."  *Id.* at 3.  Furthermore, Stephens was given credit for 1,222 days served.[5]

Stephens completed his state sentence on February 28, 2003, *see* Inmate Record, Ex. E to Hazelton Decl. (document # 7), some eight years and six months after being arrested in August 1994.[6]  He was *immediately transferred to federal custody.*  *See* Sentence Monitoring Computation Data at 2, Ex. J to Hazelton Decl. (document # 7).  His full-term release, eight years from that date, is February 27, 2011; with anticipated good-conduct time, Stephens will be released on February 16, 2010.  *Id.*

### B.  *Procedural History*

Stephens filed this habeas corpus petition pursuant to 28 U.S.C. § 2241, seeking to have the Court review the Bureau of Prisons's ("BOP's") calculation of his sentence.  He has exhausted his administrative remedies.  *See* Petition at 2 (document # 1);  Response to Request for Administrative Remedy # 386315–F1, Ex. I to Hazelton Decl. (document # 7).  The Bureau of Prisons has moved to dismiss, and Stephens opposes.

## II.  ANALYSIS

Stephens contends that he is entitled to credit on his federal sentence for at least some of the time he spent in state custody. The case thus requires the Court to con-

---

3.  Strangely, Florida's Department of Corrections records seem to indicate that Stephens was transferred to federal custody on December 5, 2000, a little over a month before his sentence was vacated in the first place.  *See* Overall Inmate Record at 3 (June 10, 2003), Ex. E to Hazelton Decl. (document # 7).  The record is silent as to Stephens's location between January 2001 and September 2001.

4.  The reason for the retroactivity to that date is not clear.

5.  It is not clear how the state court arrived at this figure.  1,222 days before the effective date of the new sentence is October 10, 1998,

still over a year after the original sentence was imposed.  And 2,742 days, or seven years and six months, had elapsed between Stephens's arrest in August 1994 and the effective date of his resentencing, February 14, 2002.  However, as explained below, it is also unclear whether the error harmed Stephens: he actually served less time than his resentencing called for.  In any event, the calculation of the Florida sentence is not before the Court.

6.  Nine years and four months from his original arrest date would have placed his release on December 14, 2003.

sider when and how his sentences commenced.

### A. *The Writ of Habeas Corpus Ad Prosequendum*

■ Stephens's first argument is that he became a federal prisoner when he was brought into federal court on December 6, 1994, and therefore that his federal sentence should be counted from that date.

■ The sovereign that first arrests a defendant takes primary jurisdiction over him. *See, e.g., United States v. Cole,* 416 F.3d 894, 897 (8th Cir.2005). It retains that jurisdiction until it takes a specific act to relinquish it, such as release on bail, parole, or the dismissal of pending charges. *See id.* In addition, the sovereign may, in an act of executive discretion, waive the right to primary jurisdiction and turn the defendant over to another sovereign. *See, e.g., Poland v. Stewart,* 117 F.3d 1094, 1097–98 (9th Cir.1997) (citing *Ponzi v. Fessenden,* 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922)). As of December 5, 1994, the day before he was brought into federal court for his trial, the State of Florida clearly had jurisdiction over Stephens, because it had arrested him and had done nothing to relinquish its jurisdiction.

■ On December 6, when Stephens appeared in federal court, he did so by way of a federal writ of habeas corpus ad prosequendum. The use of that writ did not signal that Florida authorities relinquished their primary jurisdiction over Stephens. To the contrary, the federal writ only "borrows" the defendant from state custody. *See, e.g., United States v. Casas,* 425 F.3d 23, 67 (1st Cir.2005); *Jake v. Herschberger,* 173 F.3d 1059, 1061 n. 1 (7th Cir.1999).

When the writ is used, the defendant officially remains in the jurisdiction of the sovereign from which he was borrowed, even though his custodians change. The rule allows one sovereign to produce the defendant for trial without impinging on the rights of the other. Therefore, when Stephens was brought into federal court on December 6, 1994, he remained under the sole jurisdiction of the state of Florida. His federal sentence did not begin to run and he was returned to state custody after the trial was completed.[7]

### B. *The Effect of the State Court's Order That the Sentences Were to Run Concurrently*

■ Next, Stephens contends that he is entitled to federal credit for the time served between February 10, 1997—the date of his original state sentence—and at least January 10, 2001—the date that sentence was vacated. The state court had, after all, ordered that the sentences run concurrently.

The problem was that the federal court had not so ordered. Its judgment was silent as to any possible relation with Stephens' sentence on the then-pending state court charges. *See generally* Federal Judgment, Ex. A to Hazelton Decl. (document # 7). The federal court could have ordered a concurrent sentence, even though no state sentence had yet been imposed: under Eleventh Circuit law, "a district court does have the authority to make a federal sentence concurrent to a state sentence not yet imposed for pending state charges." *United States v. McDaniel,* 338 F.3d 1287, 1288 (11th Cir.2003) (clarifying the holding of *United States v. Ballard,* 6 F.3d 1502 (11th Cir.1993)). Without any statement by the federal trial

---

**7.** The Court therefore need not consider whether his federal sentence would have begun if he had been remanded immediately to federal authorities. *Cf. Taylor v. Reno,* 164 F.3d 440, 445–46 (9th Cir.1998).

court, however, the Bureau of Prisons was left to presume that the sentences were to run consecutively. *See* 18 U.S.C. § 3584(a) (providing that when two sentences are imposed at different times, they presumptively run consecutively). And the power to determine whether federal prisoners receive credit for time spent in state custody prior to the commencement of their federal sentence is a matter left solely to the discretion of the Attorney General. *United States v. Wilson,* 503 U.S. 329, 331–32, 334, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992); *see also* 18 U.S.C. § 3585(b).

■ It was a grave error by Stephens's counsel. Because Stephens had never been in federal jurisdiction, his federal sentence had not yet commenced. During the period of time it took to litigate the federal charges, Stephens was in the temporary custody of the federal government by way of the writ of habeas corpus ad prosequendum; for the reasons explained above, that did not transfer jurisdiction to the federal authorities. Nor could the state court make the federal sentence commence. An order by a state court that its sentence run concurrently with a federal court's sentence is nothing more than a recommendation; it cannot dictate to the federal system the terms under which a federal sentence is to be served. *See, e.g., Taylor v. Sawyer,* 284 F.3d 1143, 1151–52 (9th Cir.2002).[8] Therefore, upon being sentenced by the Florida court, Stephens began to serve his state sentence, but the clock was not yet running on his federal sentence.

Stephens could have sought to answer the Florida charges first and receive sentence in that court before being sentenced in federal court. As long as the defendant is, in fact, serving the first sentence, the sovereign sentencing second has a much simpler time implementing its wishes. By ordering that its sentence will run concurrently or partially concurrently to the one the defendant is already serving, a federal court has the ability to add as much time to the end of the defendant's current sentence as it deems appropriate. *See* 18 U.S.C. § 3584(a) (providing that "if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively"); *United States v. Matera,* 489 F.3d 115, 124 (2d Cir.2007) (interpreting § 3584(a) to permit the district court, in its discretion, to impose a sentence that was concurrent, partially concurrent, or consecutive); U.S. Sentencing Guidelines Manual § 5G1.3(c) (2007) ("[T]he sentence ... may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.").

A state court may do the same—make its state sentence run concurrently with a preexisting federal sentence—if allowed by state law. Florida's law does not. *Compare Abrahams v. Comm'r of Correction,* 57 Mass.App.Ct. 861, 863–65, 786 N.E.2d 1249 (2003) (permitting such a sentence), *with Doyle v. State,* 615 So.2d 278, 278 (Fla.App. 3 Dist.1993) (per curiam) (holding that Florida law gives to the Florida Department of Corrections discretion re-

---

**8.** The obverse is true as well. In *United States v. Caldwell,* 358 F.3d 138 (1st Cir. 2004), a federal prisoner in federal custody had already been sentenced on state charges. The First Circuit held that the district court "lacked the power to order Caldwell's state

sentences to begin to run." *Id.* at 144. Still, the sentencing judge could have designated the federal term as concurrent to the state sentence, freeing Caldwell to try to secure the state court's approval as well. *See id.* at 144–45 & n. 16.

garding the placement of inmates serving sentences for multiple jurisdictions, so a Florida trial court cannot order that a Florida sentence be served concurrently with any other sentence, and deeming such an order a "recommendation").

### C. *The Mistaken Transfer to Federal Authorities*

■ Stephens's final contention is that his federal sentence began when he was mistakenly transferred to federal custody in 2001. The Court agrees. The time at which a federal sentence begins is governed by 18 U.S.C. § 3585(a): "A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to … the official detention facility at which the sentence is to be served." For Stephens, that date was September 20, 2001.

That day, the U.S. Marshals took Stephens into federal custody with the intention of transporting him to FCI–Jesup to begin serving his federal sentence. When they did so, the federal government took primary jurisdiction over him. As noted above, the sovereign with primary jurisdiction continues to have jurisdiction until some affirmative act relinquishes it. In this case, the "expiration" of the petitioner's state sentence and the affirmative act of transferring him to federal authorities suffice. *See Cole*, 416 F.3d at 897; *Jimenez v. Warden, FDIC, Fort Devens*, 147 F.Supp.2d 24, 28 (D.Mass.2001). When Stephens was remitted to the Marshals, Florida no longer claimed any hold on him; to the contrary, it disavowed having one. *See* Custody Report at 1, Ex. B to Hazelton Decl. (document # 7). And Florida permitted the United States to take physical custody of Stephens without the use of a writ, which would have maintained its primary jurisdiction. It thus voluntarily, if mistakenly, allowed the United States to take primary jurisdiction over Stephens. *See Weekes v. Fleming*, 301 F.3d 1175, 1180–81 (10th Cir.2002). *See also* Fed. Bureau Prisons, *Sentence Computation Manual* at 1–12, Program Statement 5880.28 (July 19, 1999) (defining exclusive federal custody as custody obtained without the use of a restrictive writ).

■ Moreover, the decision to release Stephens was well within the discretion of the Florida Department of Corrections. Surrendering primary jurisdiction is an executive function. *See Ponzi*, 258 U.S. at 261–62, 42 S.Ct. 309 (locating decision to relinquish jurisdiction in executive power). Determining the placement of inmates serving sentences from multiple jurisdictions is similarly a matter of executive discretion, *see Doyle*, 615 So.2d at 278, the calculation of time to be credited against the prisoner's sentence is also a task for the Department of Corrections, *see, e.g., Miller v. Florida*, 882 So.2d 480, 481–82 (Fla.App. 5 Dist.2004) (holding that calculation of gain-time credit, similar to federal good-time credit, is a matter of executive discretion). The Florida Department of Corrections' statement to the U.S. Marshals that Stephens was finished serving his Florida sentence was a statement—even if mistaken—that Stephens had satisfied his obligation to the state's correctional system. *Cf.* Fla. Stat. § 921.001(10)(b) (stating conditions under which a prisoner may be released from his term of incarceration).

It makes no difference that Florida's relinquishment of jurisdiction was accidental. In this area, courts have consistently held executives to a negligence standard. *See, e.g., Vega v. United States*, 493 F.3d 310, 319 (3d Cir.2007); *United States v. Martinez*, 837 F.2d 861, 865 (9th Cir.1988). Florida's act of relinquishing jurisdiction when Stephens had not yet been resentenced was clearly negligent, and the

Court will hold it to the plain import of its actions.

This decision does not contravene the principles of comity on which this area of the law is founded. *See, e.g., Bowman v. Wilson,* 672 F.2d 1145, 1153–54 (3d Cir. 1982) (citing *Ponzi,* 258 U.S. at 259–60, 42 S.Ct. 309). To the contrary, it reinforces them. Permitting Florida to rescind its decision to surrender jurisdiction over Stephens would badly erode the current bright line dictating which sovereign has jurisdiction over the prisoner. A sovereign asserting mistake would have the prerogative to transfer the prisoner or take other actions that might offend the receiving state. Moreover, the receiving sovereign would arguably be entitled to the costs of maintaining the prisoner during the "mistaken" period.[9]

■ Allowing rescission would also unnecessarily harm inmates. For a period of time after a transfer, a prisoner would reasonably be uncertain as to whether he was subject to the jurisdiction of the first or second sovereign. That would obscure what rights he had—for example, the extent of process available at a disciplinary hearing, or what civil rights suits might lie, or how to seek post-conviction relief. And prisoners have a fundamental right to know who is holding them and why. *See* U.S. Const. Amend. V, XIV.[10]

As of September 21, 2001, then, Stephens was unarguably in federal custody pursuant to the judgment of a federal court, notwithstanding Florida's error. Therefore, his sentence had started to run. *See Weekes,* 301 F.3d at 1179–80 (holding that where prisoner was taken into federal custody, designated to serve term of imprisonment at a particular facility, and transported to that facility, federal sentence began to run regardless of fact that federal officials had custody erroneously); *Luther v. Vanyur,* 14 F.Supp.2d 773, 775–76 (E.D.N.C.1997).[11]

The two legal sources upon which the government relies are not to the contrary. Its first citation is to a Bureau of Prisons manual. According to BOP policy,

> When it has been determined an inmate was committed improperly to federal custody and primary jurisdiction resides with a state sovereign (i.e., the inmate was under jurisdiction of the federal sentencing court on the basis of a writ of habeas corpus ad prosequendum), institution staff ... will make every effort to return the inmate to state custody. A return to the state means that the feder-

---

**9.** By contrast, both these problems are forestalled when the receiving state is entitled to rely on an enforceable prior arrangement. *See, e.g.,* Interstate Corrections Compact, Fla. Stat. § 941.56 art. IV(c) (governing ability to transfer); *id.* art. III(a) (allowing contracts concerning payments). *See also* Interstate Agreement on Detainers, 18 U.S.C.App. 2 § 2 art. V(h) (governing costs while defendants are transferred for purposes of trial).

**10.** These concerns, too, are addressed when it is clear ex ante who has jurisdiction over the prisoner. *See, e.g.,* Interstate Corrections Compact, Fla. Stat. § 941.56 art. IV.

**11.** To be clear, this is not a situation in which Florida waived or forfeited its jurisdiction al-

together. There was no extended period of release in which Stephens reintegrated into the community and detrimentally relied on his freedom. Indeed, Stephens has never set foot out of detention. *Cf., e.g., DeWitt v. Ventetoulo,* 6 F.3d 32, 34–35 (1st Cir.1993) (finding violation of due process where state suspended all but fifteen years of life sentence then, six years later, attempted to reinstate the life sentence); *Shields v. Beto,* 370 F.2d 1003 (5th Cir.1967) (holding that failure to execute eight years of a ten-year sentence for 28 years was a waiver of all jurisdiction). In this case, Florida had every right to demand that Stephens return to serve the remainder of his sentence. But that is a question entirely distinct from whether his federal sentence had started to run.

al sentence should be considered as *not* having commenced since transfer to the Bureau was in error and the prisoner should have returned to the state after sentencing as a required condition of the federal writ.

Fed. Bureau Prisons, *Designation of State Inst. for Serv. of Fed. Sentence* at 11–12, Program Statement 5160.05 (Jan. 16, 2003). The policy, though, is inapposite. Primary jurisdiction no longer resided with Florida. There was no writ with a condition of return. Rather, the federal system took Stephens free and clear of any obligation to return him to state custody. *See also Sentence Computation Manual* at 1–32A to 1–33 (stating that if there is an undischarged state term of imprisonment *and* the state has primary jurisdiction, "the prisoner shall be returned to the non-federal jurisdiction until the prisoner is released ... from the non-federal term").

The government's reliance on 18 U.S.C. § 3585(b) also fails. That statute dictates whether the defendant receives credit "for any time he has spent in official detention prior to the date the sentence commences ... that has not been credited against another sentence." *Id.* The government heavily emphasizes the fact that Florida credited Stephens's time in federal custody, *see* Resp. Mem. at 4, 7–8 (document # 7), but it is the prior clause that controls. By its terms, § 3585(b) only applies to time in detention "prior to the date the sentence commences." Because the Court concludes that Stephens' federal sentence began on September 20, 2001, § 3585(b) does not govern time in detention after that date.

■ Holding that Stephens' federal sentence began to run when he was mistakenly transferred only half-answers the case's questions, however. The next issue is whether the balance of Stephens' federal sentence could be suspended when the

U.S. Marshals returned him to Florida's custody on May 23, 2002—i.e. whether his federal sentence, having started running, could stop temporarily.

■ There exists a strong common-law rule against the interruption of sentences. Where the prisoner is not at fault for the lapse in the sentence—for example, by escaping—the period of incarceration runs continuously from the date it begins. "The government is not permitted to play cat and mouse with the prisoner, delaying indefinitely the expiation of his debt to society and his reintegration into the free community. Punishment on the installment plan is forbidden." *Dunne v. Keohane,* 14 F.3d 335 (7th Cir.1994). *See also Vega,* 493 F.3d at 314–15 (recognizing rule); *Martinez,* 837 F.2d at 865 (same); *White v. Pearlman,* 42 F.2d 788, 789 (10th Cir.1930) (same).

Some courts have found that the rule applies even where a prisoner continuously remains in custody. *See Weekes,* 301 F.3d at 1181–82; *Luther,* 14 F.Supp.2d at 778–79. Others have argued that the force behind the rule is diminished where the prisoner is never released into the community, and where the error does not contradict the expectations at the time of sentencing as to when the government's coercive power over the prisoner expires. By the logic of those courts, Stephens is in the same position now as he would have been without the administrative error, and thus would not be entitled to relief. *Dunne,* 14 F.3d at 337; *Free v. Miles,* 333 F.3d 550, 554–55 (5th Cir.2003).

Neither bright-line rule is appropriate. The common-law rule against interruptions is clearly derived from the court's equitable power to ensure that sentences are served in a fair and appropriate manner. *See White,* 42 F.2d at 789; *Vega,* 493 F.3d at 317 (rejecting constitutional basis for

the rule and holding that its "roots" are in the common law). *But cf. Dunne,* 14 F.3d at 336 (suggesting that the rule is one of "interpretation," though not specifying what statute is being interpreted). Therefore, to determine whether Stephens should receive federal credit for time spent in state prison after his erroneous transfer, the Court looks to the purposes underlying the common-law rule. The Third Circuit has suggested three: fairness to the prisoner, protection against excessive executive power, and the sovereigns' interests in seeing that convicted criminal serve out their sentences. *Vega,* 493 F.3d at 318. By balancing those interests, the Court will determine whether Stephens is entitled to time "at liberty" from the federal penal system, but in Florida's.[12]

The first factor, fairness to the prisoner, does not weigh heavily in Stephens' favor in this case. He could not have reasonably believed that he was, in fact, finished with his state sentence: it had been vacated to be reimposed at a later date. *See* Order Vacating Sentence at 1, Ex. F to Hazelton Decl. (document # 7). (Although the record is unclear on this point, it appears that Stephens was transferred before ever being resentenced.) He should have known that Florida was not yet finished with him, diminishing any reliance interest he had in the transfer to the federal system. Moreover, Stephens had no interest in being placed in any particular correctional institution, *see Meachum v. Fano,* 427 U.S. 215, 224–25, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), or right against being transferred from one to another, *see Olim v. Wakine-*

*kona,* 461 U.S. 238, 244–48, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). Nor can he assert a fairness objection to the overall length of time he is subject to coercive government action, given that the he has been serving one or another of his consecutive sentences every day since he was arrested in August 1994 and that the total period of time during which the sovereigns have claim over him has not been extended.

The second *Vega* factor is whether the manner of release implies the availability of excessive executive power. *See* 493 F.3d at 318; *Smith v. Swope,* 91 F.2d 260, 261–62 (9th Cir.1937). This case does not present the same concerns as erroneous release cases, where a defendant is in the community but can be yanked into jail at the discretion of the jailer. It does, however, have some troubling aspects. Accepting the government's argument at face value, an asserted ministerial error effectively overrules the automatic operation of a federal statute dictating when a sentence begins. Moreover, allowing such a mistake to pass without consequence fails to emphasize to the jailers their responsibility to the prisoners whom they are charged with keeping, and does not deter such mistakes in the future.

The third factor is the sovereigns' interest in punishing a prisoner as they said they would. *See Vega,* 493 F.3d at 318. To determine what this factor suggests, the Court looks to the intent of the sentencing courts. The federal court was silent as to the relationships between its sentence and the state court's. *See generally* Federal Judgment, Ex. A to Hazelton

---

12. In its opinion in *Vega,* the Third Circuit did not balance these factors against one another. Rather, it wove them into the burden-shifting test it derived for determining whether a prisoner should be credited for time spent in the community after being erroneously released from all penal systems. *See id.* at 319–22. The facts in that case are therefore very differ-

ent, and the court's analysis was appropriately directed to whether "releasees who have readjusted to life outside of confinement ... should receive credit for their premature freedom." *Id.* at 322–23. As the divergence among Circuit Courts of Appeals shows, this Court's analysis must begin at an earlier stage—whether the rule applies at all.

Decl. (document # 7). The state court, on resentencing in 2002, commanded that the sentences were to be served consecutively. Sentence at 3, Ex. C to Hazelton Decl. (document # 7). This Court must therefore find that the sovereigns each intended its sentence to run consecutively to the other. *See* 18 U.S.C. § 3584(a).

When those interests are weighed against one another, they compel the conclusion that, on the facts of this case, Stephens is not entitled to credit for his time "at liberty" from the federal system, time spent serving a consecutive Florida sentence. The common-law rule should not frustrate the sovereigns' intent to impose separate sentences on Stephens, especially where Florida's negligence would harm the federal government's interest in Stephens' incarceration and not its own. *See, e.g., Vega,* 493 F.3d at 320–22 (concluding that the imprisoning sovereign must be the negligent one for credit for time at liberty to be awarded).

■■■ The petitioner is, however, entitled to credit on his federal sentence for the period between September 20, 2001, and May 23, 2002. Florida's decision to relinquish jurisdiction was effectively a decision to allow Stephens to serve part of his sentence concurrently with the federal system.[13] When the federal authorities accepted Stephens, his sentence began to run by operation of statute, and not through any further discretionary act by a federal official. *See* 18 U.S.C. § 3585(a). The sentence was interrupted some eight months later when federal officials returned Stephens to Florida. But during

that intervening period, Stephens was undoubtedly a federal prisoner and not just in federal custody.

## III. *CONCLUSION*

Stephens' federal sentence began to run on September 20, 2001, when he was taken into federal custody and under sole federal jurisdiction. It ran until May 23, 2002, when he was returned to state custody and placed under Florida's sole jurisdiction, and Stephens is entitled to credit on his federal sentence for that period. **The Bureau of Prisons is ORDERED to so credit him.** The federal sentence was interrupted when Stephens was returned to state custody. He is not entitled to credit on his sentence for the period after May 23, 2002 until he finished serving his Florida sentence.

The Motion to Dismiss (document # 6) is **GRANTED in part and DENIED in part,** and the Petition for Habeas Corpus (document # 1) is **ALLOWED.**

**SO ORDERED.**

---

13. The Court takes no position on whether the common-law rule against interruptions would have required *Florida* to credit Stephens for the time he spent in federal custody during this period. Notably, in such a case, the negligent sovereign would be the one against whom the credit was asserted, aligning more closely the rationale for the rule with its effect. *See Vega,* 493 F.3d at 320 ("The rule of credit for time at liberty serves as a limit on the power of the marshals or ministerial officers engaged in imprisoning defendants, and encourages these same officials to take responsibility for the prisoners with whose custody they are charged.").